# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3731

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Daryl Miles Brown, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: September 20, 2010
Filed: December 22, 2010

_____

Before WOLLMAN, LOKEN, and HANSEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

A jury convicted Daryl Miles Brown of seven counts of wire fraud, two counts of causing interstate travel in execution of a scheme to defraud, three counts of engaging in monetary transactions in criminally derived property, and one count of conspiracy to commit money laundering. 18 U.S.C. §§ 1343, 1349, 1956(h), 1957, & 2314. The district court[1] sentenced Brown to 180 months in prison. He appeals, arguing denial of his Sixth Amendment right to trial counsel of his choice, insufficient evidence, and procedural and substantive sentencing errors. We affirm.

_____

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

## I. Right to Counsel

Brown argues that the district court committed "structural" Sixth Amendment error when it refused to grant Brown his out-of-state counsel of choice because the defense could not afford to retain local counsel, as required by Rule 83.5(*l*) of the Western District of Missouri's Local Rules.[2] Brown argues that the Local Rule was unconstitutional as applied to him because he was an indigent criminal defendant. On its face, the argument seems at odds with the Supreme Court's observation that one of the limitations on a defendant's Sixth Amendment right to choose counsel is that he "may not insist on representation by an attorney he cannot afford . . . ." Wheat v. United States, 486 U.S. 153, 159 (1988). The argument was recently rejected in United States v. Menner, 374 F. App'x 446, 447 (4th Cir.) (unpublished), cert. denied, 131 S. Ct. 191 (2010). We conclude the issue was not preserved in the district court and there was no plain error.

An Assistant Federal Public Defender, Troy Stabenow, was appointed to represent Brown in October 2005, one month after he was initially charged. Nearly three years later, on the eve of a trial previously continued nine times at Brown's request, Brown moved to excuse Stabenow in part because Stabenow refused to challenge the court's jurisdiction on the ground that the United States Criminal Code was not validly enacted in 1948. Brown filed a Notice representing that a "legal team" headed by Texas attorney Engin Derkunt was prepared to represent Brown *pro hac vice*. On September 15, 2008, the magistrate judge held a status conference during which he spoke with attorney Derkunt by telephone. The judge filed a Minute Sheet of that conference stating, "Mr. Derkunt has informed the court that he would not be

---

[2]The Sixth Amendment provides in part that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Rule 83.5(*l*) provides that an out-of-state attorney "may, upon written motion, be permitted by this Court to appear . . . but only if the attorney associates with an active Missouri resident member in good standing of this Bar who shall participate in the preparation and trial of the case . . . ."

able to represent Mr. Brown." The magistrate judge granted Stabenow's motion to withdraw, appointed Stabenow as standby counsel, rescheduled the trial to October 6, 2008, and instructed Brown that, if he refused to cooperate with appointed counsel and failed to secure counsel of his own, he would be required to proceed *pro se* at trial.

Brown, Stabenow, and the prosecution appeared for the start of trial before District Judge Laughrey on October 6. Before summoning the jury panel, the court denied Brown's jurisdictional motion to dismiss and his motion for leave to file an interlocutory appeal on that issue. Brown declared, "These proceedings are void . . . [t]his is structural error," and said he was not ready for trial and did not want Stabenow's assistance as standby counsel. "What I want is my new counsel." Brown became so disruptive that Judge Laughrey excluded him from the courtroom and called a short recess, telling Brown "to contemplate whether or not you wish to proceed on your own." When proceedings resumed, Brown predicted he would "get thrown out again and again and again" if forced to represent himself. Stabenow advised, and the prosecutor confirmed, that the magistrate judge had appointed Stabenow only as advisory standby counsel. Therefore, Stabenow was not prepared to try the case that morning if trial began with Brown representing himself and he was subsequently excluded for misconduct. Brown and the attorneys then summarized the pretrial proceedings involving the magistrate judge and attorney Derkunt. Judge Laughrey decided to place a transcribed phone call to Derkunt in Texas.

At the outset of the ensuing call, Derkunt stated, somewhat inconsistently with the magistrate judge's Minute Sheet, that he was willing to enter an appearance and represent Brown at trial, even if no fee was paid, "[a]s long as the time frame is reasonable." The court, Derkunt, and the prosecutor then discussed scheduling and, after Derkunt had a private phone conversation with Brown, agreed to begin the trial on December 1, 2008. To ensure this was a firm commitment, the district court advised Derkunt "that you are going to have to have local counsel" other than the

federal public defender. When Derkunt responded he could not do that "if I have to pay for it," the court said to Brown, "I don't see any way, then, that you can be represented by Mr. Derkunt." Brown responded, "I'll have someone in place to work with him." After brief further discussion, Judge Laughrey concluded:

> All right. I'll go ahead and continue the matter to December 1st. I will make arrangements for defendant to be represented by a different standby counsel. Mr. Derkunt has not indicated that he has the ability to get local counsel. If you're able to get local counsel and have Mr. Derkunt here ready to try this lawsuit on December 1st, you may do so. But, in fact, we're going to try this lawsuit on December 1st, no matter what your explanations are or what Mr. Derkunt's explanations are or why it is that you're having trouble getting local counsel.

> In the meantime, I'm going to appoint an attorney to represent you; and if you choose not to pursue [Derkunt's] services, they will be ready to try the lawsuit as standby counsel on December 1st. And if you are misbehaving in the courtroom as you have done today, then you will be excluded from the courtroom and you will not have an opportunity to be present during your trial. And that will be your choice.

Four days later, the court appointed new standby counsel, who appeared with Brown when the trial commenced on December 1. After standby counsel cross examined the government's first witness, Brown asked that he be permitted to conduct the examination of the remaining witnesses. He was permitted to do so.

As this summary makes clear, Brown never presented the question urged on appeal to the district court. At the October 6 conference, when attorney Derkunt said he was willing to try the case on a no-fee basis but could not afford to pay local counsel, Brown advised the court, "I'll have someone in place to work with him." The court then appointed new standby counsel and gave Brown the choice of how to proceed on December 1. Thereafter, Derkunt did not apply for admission *pro hac vice.* Brown never advised the district court that the cost of local counsel was

preventing him from retaining Derkunt as counsel of choice.  Thus, as in United States v. Lewis, 759 F.2d 1316, 1327 (8th Cir.), cert. denied 474 U.S. 994 (1985), Brown did not make a request that was denied so we have no ruling to review.

The transcript of the October 6 conference, including the telephone call to attorney Derkunt, demonstrates that the district court carefully protected Brown's Sixth Amendment right to be represented by retained counsel of his choice or to represent himself at trial *pro se*, with or without the assistance of standby counsel.  At the same time, the court properly ensured that the efficient administration of justice was not hindered by never-ending requests for continuance, frivolous motions to dismiss,[3] or disruptive misconduct in open court.  There was no error, much less plain, "structural" Sixth Amendment error.  See United States v. Gonzalez-Lopez, 548 U.S. 140, 151-52 (2006), and 154-55 (Alito, J. dissenting); United States v. Cordy, 560 F.3d 808, 815-17 (8th Cir. 2009).

## II.  Sufficiency of the Evidence

Brown was charged with organizing and managing an extensive scheme to defraud in which multiple investors were lured into investing substantial sums ($30,000 to $300,000 each) by false representations that Brown was licensed to trade securities; that he was a graduate of the University of Missouri and a former professional football player for the Kansas City Chiefs; that he had access to a "unit investment trust" worth hundreds of millions of dollars; and that their investments would be safely placed in an escrow account and would be used only to "leverage" short-term investments such as stand-by letters of credit, which would double or triple their investments in one month.  In fact, the funds were withdrawn from the escrow account at the direction of Brown and put to other uses, including funding Brown's

---

[3]The Seventh Circuit described Derkunt's theory that the federal criminal code was improperly enacted as "unbelievably frivolous" in United States v. Collins, 510 F.3d 697, 698 (7th Cir. 2007) (quotation omitted).

lavish lifestyle. At trial, the government presented testimony by twenty-eight witnesses, including nine investors who described the misrepresentations that induced them to invest; six of Brown's business associates, including co-defendant Sylvester Mitchell, who pleaded guilty and agreed to cooperate with the government prior to Brown's trial; and a government investigator, who traced what happened to the investors' funds after Brown's enterprise, The Vertical Group, received them.

On appeal, Brown argues that this evidence was insufficient to convict him of each of the charged offenses because the government failed to prove intent to defraud. The argument focuses on part of Sylvester Mitchell's testimony. In January 2005, Brown, Mitchell, and at least one investor traveled to New York City for the ostensible purpose of watching a transaction take place at Citigroup headquarters that would "leverage securities," immediately making investors thousands of dollars richer. The advertised meeting was a sham. Instead, when the group arrived, the investor was excluded while Brown and Mitchell had an unscheduled meeting with a Citigroup employee who advised that the stand-by letter of credit documents Brown and Mitchell brought with them were not legitimate. Mitchell testified that Brown appeared "pretty distraught" after the meeting but nonetheless told Mitchell to tell investors, falsely, that the deal had gone through and was a success. Based on this testimony, Brown argues there was insufficient evidence to prove intent to defraud before the meeting at Citigroup, where Brown learned that stand-by letters of credit were not legitimate investments.

In reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the jury's verdict, accepting all reasonable inferences that support the verdict. "[I]ntent to defraud need not be proved by direct evidence." United States v. Radtke, 415 F.3d 826, 837 (8th Cir. 2005). Here, there was overwhelming evidence that Brown and his cohorts hatched the scheme to defraud well before this meeting in New York City. Although one of the misrepresentations used to deceive investors was that their money would be invested in stand-by letters

of credit, the essence of the scheme was to obtain investor monies with no intent to invest as promised, and to divert a substantial portion of the invested funds to Brown's personal use. Ultimately, some investors lost all their money, and none received what he or she was promised. "When the 'necessary result' of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself." United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994) (citation omitted). Here, the evidence of intent to defraud was more than sufficient to convict Brown of each count of conviction.

### III. Sentencing Issues

Brown first argues that the district court clearly erred when it imposed a four-level enhancement for being "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Brown contends there was insufficient evidence that four of the persons identified in the pre-sentence investigation report as "participants" were criminally responsible for the offense. The trial testimony conclusively established that far more than five persons assisted Brown in persuading the victims to invest and in setting up the elaborate financial arrangements by which he fraudulently diverted substantial sums to his personal use. See United States v. Cosey, 602 F.3d 943, 947-48 (8th Cir.), cert. denied, 131 S. Ct. 364 (Oct. 4, 2010). Even if many of these cohorts were themselves innocent dupes, the four-level enhancement was warranted because, without question, the criminal activity "was otherwise extensive."

Brown next argues the district court clearly erred in imposing a two-level enhancement because the scheme to defraud "involved sophisticated means." U.S.S.G. § 2B1.1(b)(9)(C); see United States v. Anderson, 349 F.3d 568, 570 (8th Cir. 2003) (standard of review). He posits that his offenses merely involved misrepresenting himself and the legitimacy of investing in stand-by letters of credit, which is not "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 comment. n.8(B). We

disagree. Brown engaged in a complex series of fraudulent transactions involving numerous victims, elaborate financial structuring, and extensive efforts to conceal the fraud as it unraveled, not unlike the schemes that led us to affirm sophisticated means enhancements in Anderson, 349 F.3d at 570-71, and in United States v. Kieffer, 621 F.3d 825, 835-36 (8th Cir. 2010). There was no clear error.

Brown next argues the district court committed procedural error when it failed adequately to explain its consideration of the 18 U.S.C. § 3553(a) sentencing factors. Four witnesses testified at sentencing, including Brown. The 113-page transcript demonstrates that the district court considered all relevant factors as it discussed alternative sentencing options, compared similar offenses from the same jurisdiction, and considered the extensive background information set forth in the pre-sentence investigation report. "We do not require district courts to mechanically recite the § 3553(a) factors" when it is clear the factors were properly considered. United States v. Lazarski, 560 F.3d 731, 733 (8th Cir. 2009).

Finally, Brown argues that the district court's failure to grant a downward departure or variance resulted in a substantively unreasonable sentence that is greater than necessary to comply with the purposes of § 3553(a)(2). As the district court was aware of its authority to depart downward, we have no authority to review its failure to do so. United States v. Woods, 596 F.3d 445, 448-49 (8th Cir. 2010). We do have authority to review the court's refusal to grant a downward variance for abuse of discretion. Gall v. United States, 552 U.S. 38, 46 (2007). Brown's 180-month sentence is within his properly determined advisory guidelines range of 168 to 210 months in prison and is therefore presumptively reasonable. See Cosey, 602 F.3d at 946. Brown has not come close to overcoming that presumption.

The judgment of the district court is affirmed.

_____

-8-