# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-1507

_____

United States of America

*Plaintiff - Appellee*

v.

Monique Calhoun

*Defendant - Appellant*

_____

No. 12-2246

_____

United States of America

*Plaintiff - Appellee*

v.

Tyrone Ross

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: February 15, 2013
Filed: July 24, 2013
_____

Before RILEY, Chief Judge, LOKEN and SHEPHERD, Circuit Judges.
_____

LOKEN, Circuit Judge.

Edwon Simmons, Tyrone Ross, and others used stolen credit cards to purchase airline tickets and resell them on a Chicago "black market." Monique Calhoun purchased several tickets from Simmons and, when questioned by a federal Postal Inspector, lied about where she obtained them. A jury convicted Calhoun of two counts, conspiracy to commit access device fraud and aggravated identity theft and making false statements to investigators. See 18 U.S.C. §§ 371, 1029(a)(5), 1028A(a)(1), and 1001(a)(2). The district court[1] sentenced her to two years' probation. She appeals the convictions, arguing insufficient evidence, several evidentiary issues, and ineffective assistance of counsel. Ross pleaded guilty to conspiracy to commit access device fraud and aggravated identity theft, access device fraud, and aggravated identity theft. He appeals his 84-month sentence, arguing the district court committed procedural sentencing errors in estimating fraud loss and the number of victims and in imposing a sophisticated means enhancement. We affirm.

## I. Monique Calhoun's Appeal.

*A. Sufficiency of the Evidence.* Calhoun argues there was insufficient evidence to convict her of the conspiracy and false statement offenses. Normally, we review the evidence in the light most favorable to the jury's verdict to determine if it was sufficient to prove the elements of each crime beyond a reasonable doubt. See United

---

[1]The Honorable Fernando J. Gaitan, Chief Judge of the United States District Court for the Western District of Missouri.

States v. Jenkins-Watts, 574 F.3d 950, 959 (8th Cir. 2009), cert. denied, 559 U.S. 1019 (2010) (standard of review). But here, the record on appeal reflects that Calhoun did not move for judgment of acquittal at the close of the government's case, at the close of all evidence, or after the jury's verdict. Therefore, she forfeited this argument, and we reverse only if the district court, in not *sua sponte* granting judgment of acquittal, committed plain error. See United States v. Milam, 494 F.3d 640, 643 (8th Cir. 2007). To demonstrate plain error, Calhoun must show (1) error, (2) that was plain, (3) that affects her substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. United States v. Pirani, 406 F.3d 543, 550 (8th Cir. 2005) (en banc). Submitting a charged offense to the jury is *plain* error "only if there was a manifest miscarriage of justice, which would occur if there is no evidence of the defendant's guilt or the evidence on a key element of the offense was so tenuous that a conviction would be shocking." United States v. Villasenor, 236 F.3d 220, 222 (5th Cir. 2000); accord United States v. Lewis, 100 F.3d 49, 53 (7th Cir. 1996).

*1. Conspiracy.* Count 1 of the indictment charged Simmons, Ross, Calhoun, and eight others with conspiring to commit access device fraud and aggravated identity theft "by devising and executing a scheme and artifice to defraud, which was to obtain stolen access device information consisting of credit and debit card numbers . . . without the authority of the cardholders . . . and then transmitting . . . the stolen access device information . . . to make fraudulent purchases on the reservation systems of the domestic airline industry." Simmons was a "black market travel agent" who obtained the tickets using stolen credit cards. Calhoun, a young fashion model, was the only defendant indicted for her role as a buyer of the fraudulently acquired airline tickets. The other defendants, all of whom pleaded guilty, participated in using stolen credit cards to obtain airline tickets sold to black market customers such as Calhoun.

Four witnesses testified for the government at Calhoun's two-day trial. Susan Weiler, a corporate security officer for United Airlines, testified that she cooperated with law enforcement to identify stolen tickets and the people who used them. She presented the jury a list of nine United Airlines tickets used by Calhoun in the summer of 2009 and testified that these tickets bore common indicia of fraudulent purchase -- one-way tickets paid for with a credit card not in the name of the passenger and purchased within a few hours of the flight's scheduled departure. Byron Pierce, an Overland Park, Kansas, police detective, and Steven Ryan, a U.S. Postal Inspector, testified that their investigation led them to ticket-seller Simmons, and they obtained a court order to wiretap Simmons's phone during August 2009. The wiretap recorded conversations between Simmons and Calhoun concerning her purchase of tickets that Simmons acquired using stolen credit card data.

Simmons then testified for the government pursuant to a plea agreement. He explained working with others to obtain stolen credit card account information, using that information to fraudulently charge airline tickets to the accounts, and selling the tickets on the black market. Buyers requested tickets by text message and paid Simmons by deposits to his personal bank account. Simmons confirmed the money was in his account, fraudulently bought the tickets on-line from the airline a few hours before the flight, and sent the buyer the ticket confirmation number. The buyer obtained a boarding pass from the airline's automated kiosk at the airport. Simmons's prices were usually less than half the cost of a legitimate ticket. He warned buyers not to use their own credit cards to pay for expenses such as checked luggage, because the airlines could use those credit cards to link the buyer to the ticket purchased from Simmons. When problems arose, such as a buyer getting "bumped off" a flight, Simmons would tell his customers, who included NFL players and other celebrities, that he was "working with numbers." He explained on cross examination:

Q      So that means that all those football players you told that, I'm working with the numbers, would then be on notice that you're using illegal workings to acquire what they need, to obtain the tickets?

A      I'm saying I'm working with numbers. Now, how they take that is totally different than me saying, I'm working with stolen credit card numbers. I never said, I'm working with stolen credit card numbers. I would say I was working with numbers.

Simmons testified that he sold Calhoun eight to twelve airline tickets purchased with stolen credit cards. At least twice, he was unable to procure a ticket, leaving Calhoun at the airport with no way to fly. When his happened, Simmons told Calhoun he needed to talk to someone at the airline and said she could either purchase a ticket herself and he would give her "credit" for a future flight, or she could wait until he obtained a ticket. In May or June 2009, Calhoun called Simmons and said she received a letter from an airline "saying that her flight was not paid for by a legit credit card" and seeking payment for the flight. After confirming Calhoun had paid for a checked bag with her own credit card, Simmons told her: "Don't worry about the letter. Just don't use your credit card to check in at the kiosk." Calhoun continued to purchase tickets from Simmons. The government did not introduce into evidence either the airline letter to Calhoun, which Simmons never saw, or a form letter airlines used in this situation.

In August 2009, based on wiretap-recorded conversations, Inspector Ryan left Calhoun voice-mails saying he was a U.S. Postal Inspector and wanted to ask about her air travel. Before calling Ryan, Calhoun called Simmons. In this recorded conversation, Simmons instructed Calhoun to tell the investigator she obtained the tickets on Craigslist. The next day, in a recorded conversation, Calhoun told Ryan she bought three tickets from sellers on Craigslist, using money orders purchased at locations and sent to persons she did not remember. Those tickets were introduced

at trial along with evidence Simmons purchased them using stolen credit cards and resold them to Calhoun at his usual, deeply discounted prices.

At the conclusion of the evidence, the district court instructed the jury that, to convict Calhoun of the conspiracy charged in the indictment, they must find, beyond a reasonable doubt, that Calhoun intentionally joined an agreement between two or more persons "to commit Access Device Fraud and Aggravated Identity Theft . . . by creating and operating a nationwide 'black market' for the sale of airline tickets," and that "she knew the purpose of the agreement." This was a correct instruction. "Conspiracy to commit a particular substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself." Ingram v. United States, 360 U.S. 672, 678 (1959) (emphasis in original; quotation omitted). On appeal, Simmons argues the evidence was insufficient to establish that she knew of and participated in an agreement the "essential object" of which was to commit access device fraud and aggravated identity theft. United States v. Clay, 618 F.3d 946, 951 (8th Cir. 2010).

The government responds with the well-established rule that it need not prove that a relatively minor conspirator knew all the details of the conspiracy and who participated in it. See Jenkins-Watts, 574 F.3d at 959. Here, the government asserts, there was "plenty of evidence" that Calhoun knew she was buying below-cost airline tickets from Simmons that he obtained in a fraudulent manner. We agree. As the prosecutor summarized the evidence in closing argument:

> [M]any of these customers knew . . . at a minimum that this was shady. This was not legit. If you listen to these calls of Edwon dealing with Monique Calhoun, it's obviously not a legitimate travel agency. They can only book at the last minute? They can only do one-way flights? The cost of these flights that should be the most expensive tickets the airlines offer are actually only costing a fraction of what a normal person would pay?

-6-

But the problem with the government's case is that it did not charge Calhoun with a scheme to defraud the airlines. It charged her with knowing participation in a conspiracy to steal other peoples' credit cards. The distinction is graphically illustrated near the end of Calhoun's recorded conversation with Inspector Ryan:

> Ryan: Monique if I had your credit card and you didn't know [it] and I went on line to purchase a ticket I'd be committing aggravated identity theft . . . that's a federal offense, do you understand that?
>
> Calhoun: mmm, so now that involves me?
>
> Ryan: . . . you flew on these tickets, so that's a problem, but you said you bought these on Craig's List . . . . Is that correct?
>
> Calhoun: Yeah . . . I did, but I'm sitting here thinking like, I just thought that the people that were, you know getting them just got discount tickets and I just send them a money order but like I never knew, never thought . . . they could probably use them as stolen credit card like this, this is really deep, this is a different story.

On the essential issue whether Calhoun knew the object of the charged conspiracy, the government's evidence was razor-thin. Its evidence that Calhoun knew of and joined the conspiracy *charged in the indictment* consisted of Simmons's testimony that Calhoun described an airline letter she received in mid-2009 as referring to stolen credit cards -- testimony the government did not corroborate with evidence from airlines that had struggled for years to bring down multiple black-market-travel-agent conspiracies -- plus inferences the jury could draw from Simmons's ambiguous statement to Calhoun and other customers, "I work with numbers." A slim case, indeed. But in resolving this issue, we must recall our standard of review in conducting plain error review when sufficiency of the evidence is first raised as an afterthought on appeal -- miscarriage of justice. Here, the

evidence at a minimum proved Calhoun guilty of a scheme to defraud the airlines, even if she did not know that access device fraud and aggravated identity theft were the "essential objects" of her co-conspirators' far-flung criminal operations. At sentencing, acknowledging Calhoun was the least culpable defendant, the government supported an advisory guidelines range of 0 to 6 months and an order of restitution limited to the tickets she purchased from Simmons. The district court adopted those recommendations and sentenced Calhoun to two years' probation. The trial record is not devoid of evidence pointing to guilt, nor was the evidence on this element of the conspiracy so tenuous that a conviction would be shocking. Accordingly, we conclude there was no miscarriage of justice and will affirm the conviction.

*2. False Statements.* This charge was based on Inspector Ryan's recorded August 2009 call to Calhoun, when she falsely told him she purchased the tickets on Craigslist, gave Ryan a false home address, and falsely claimed not to have any bank account. In that call, Ryan explained that he was a U.S. Postal Inspector conducting a criminal investigation in the Western District of Missouri, that Calhoun had used airline tickets purchased with credit cards whose cardholders denied authorizing the purchases, and that "it's a felony to lie to a federal agent."

Calhoun argues that, because she did not know about a conspiracy to steal credit card information or how Simmons was obtaining the tickets, the evidence was insufficient to prove that she knowingly lied to Inspector Ryan for the purpose of concealing the conspiracy charged in the indictment. But this argument ignores the case as it was submitted to the jury. The district court instructed the jury, without objection, that it must find that Calhoun knowingly made a false statement to Inspector Ryan "regarding the manner in which she had acquired airline tickets," and that the statement was material to an investigation of Calhoun's participation in a black market airline ticket scheme within the jurisdiction of the Postal Service. The instruction accurately stated the elements of a false statement offense. See United States v. Rice, 449 F.3d 887, 892 (8th Cir.), cert. denied, 549 U.S. 1040 (2006). The

evidence was clearly sufficient to establish, at a minimum, that Calhoun, acting on advice or instructions from Simmons she should never have sought, knowingly lied about how she had purchased airline tickets for the purpose of concealing her real source from a federal agent investigating fraudulent use of credit cards to purchase tickets. The jury could reasonably conclude from this evidence that she knowingly violated 18 U.S.C. § 1001(a)(2).

*B. Evidentiary Issues.* Calhoun, with new counsel on appeal, argues the district court committed plain error when it failed, *sua sponte*, to exclude Inspector Ryan's testimony about what he was told during the course of his investigation by two groups of people, credit card holders who told him they had not authorized use of their credit cards to purchase specific airline tickets, and ticket purchasers who "cooperated" in the investigation and truthfully told him they bought their tickets from Simmons. Calhoun contends for the first time on appeal that the statements were inadmissible hearsay, unfairly prejudicial, and violated her rights under the Sixth Amendment's Confrontation Clause. These contentions are without merit.

Regarding the credit card holders, Ryan also recited that specific cardholders had denied authorizing use of their cards in his recorded conversation with Calhoun in August 2009. Calhoun does not argue -- and could not credibly argue -- that this conversation was inadmissible. Moreover, Simmons testified he used stolen credit card information to acquire the airline tickets he sold to Calhoun and other customers, a fact that was not relevant to Calhoun's defense and therefore not contested at trial. This issue was waived, not merely forfeited; plain error review is unnecessary.

Regarding Ryan's testimony relating to other celebrity buyers, plain error review is even more inappropriate. At trial, defense counsel faced a rather perplexing tactical question -- was evidence regarding Simmons's other customers helpful to the defense, because it put Calhoun in a group of many other people not alleged to be conspirators, or was it harmful, because her comparative lack of cooperation put her

in a bad light? Counsel's decision not to object to testimony by the investigators regarding their contacts with celebrities such as NFL football players was a matter of trial tactics. A trial judge should not usurp such decisions with *sua sponte* evidentiary rulings. Moreover, this evidence was neither irrelevant nor unfairly prejudicial.

For these reasons, among others, the district court committed no prejudicial abuse of discretion, much less plain error amounting to a miscarriage of justice, in not *sua sponte* excluding this evidence.

*C. Ineffective Assistance.* Finally, Calhoun argues that trial counsel's failure to object to this allegedly improper hearsay evidence constituted ineffective assistance of counsel in violation of the Sixth Amendment. See Strickland v. Washington, 466 U.S. 668, 687 (1984). The ineffective assistance standard is highly deferential to an attorney's judgment, particularly on issues such as whether to object to the introduction of evidence at trial. Thus, proof of ineffective assistance and prejudice would almost certainly require a showing of why counsel did not make the specific objections in question. Accordingly, we will follow our normal practice and not consider these claims on direct appeal. See, e.g., United States v. Thompson, 690 F.3d 977, 992-93 (8th Cir. 2012), cert. denied, Deleo v. United States, 133 S. Ct. 1611 (2013).

## II. Tyrone Ross's Appeal.

Tyrone Ross argues on appeal, as he did at sentencing, that the district court committed three procedural errors in imposing the 84-month prison sentence.

*A. Fraud Loss.* The advisory guidelines provide for progressive increases to the base offense level if the actual or intended loss attributable to a fraud offense exceeds $5,000. In this case, Ross's Presentence Investigation Report (PSR)

recommended a 16-level enhancement based on an estimated fraud loss of $1,000,000 to $2,500,000. See U.S.S.G. § 2B1.1(b)(1)(I). Ross timely objected to this recommendation and submitted a Sentencing Memorandum arguing he should be responsible only for 200 trips booked by him with an average value of $600, for a total fraud loss of $120,000.

At sentencing, the government introduced the following evidence by stipulation, supplemented by cross examination of Postal Inspector Ryan: a warrant search of Ross's cell phone revealed 220 passenger names in the summer of 2009; a warrant search of his home uncovered 175 flight confirmations in 2008 and 2009 and 750 stolen credit card profiles; in an intercepted conversation, Ross bragged to Simmons that he bought batches of fifty stolen credit cards from "Big Dog" every week and a half; a forensic examination of Ross's computer showed a batch of fifty cards stored in January 2009 and digital photos of the conspirators at the Pro Bowl in Hawaii in February 2008; in an interview, Simmons provided agents a "very conservative estimate" that Ross likely booked 1,000 reservations per year from 2007 to September 2009.

The district court overruled Ross's objection to the PSR's recommendation, noting that Ross failed to take into account the breadth of the conspiracy, the reasonably foreseeable activities of his co-conspirators, and the one-to-two-year period in which he was a highly active participant. Ross argues the court clearly erred because "the government provided little or no evidence of the loss amount attributed to Ross."

We review a fraud loss finding for clear error. See United States v. Gregoire, 638 F.3d 962, 970 (8th Cir. 2011). The court's loss calculation may be based on a reasonable estimate from the available evidence and includes "reasonably foreseeable pecuniary harm" resulting from jointly undertaken criminal activity. Jenkins-Watts, 574 F.3d at 961; see U.S.S.G. §§ 1B1.3(a)(1)(B); 2B1.1, comment. (n. 3(A)(i)). The

guidelines direct that every unauthorized charge made with a credit card causes a loss of at least $500. U.S.S.G. § 2B1.1, comment. (n. 3(F)(i)). Here, the government's evidence, while necessarily in summary form, clearly proved by a preponderance of the evidence that the Chicago conspirators booked at least 2000 flights using stolen credit cards during the period when Ross was an active participant. Thus, the district court's finding that the fraud loss exceeded $1,000,000 was not clearly erroneous.

*B. Number of Fraud Victims.* The guidelines impose a 6-level enhancement if a fraud offense "involved 250 or more victims." U.S.S.G. § 2B1.1(b)(2)(C). "Victims" means both persons who suffer financial loss and those whose credit card accounts are accessed without their permission. Id. at comment. (n. 4(E)). The PSR recommended imposing this enhancement. The district court overruled Ross's timely objection, relying on the above-summarized evidence. Ross argues the court clearly erred because the number of victims should be limited to his estimate that he booked 200 flights. We disagree. The government submitted sufficient evidence that Ross directly victimized more than 250 persons, and the foreseeable actions of his co-conspirators involved even more victims.

*C. Sophisticated Means.* The guidelines impose a 2-level enhancement if a fraud offense "involved sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C) & comment. (n.8(B)). The PSR recommended imposing this enhancement, and the district court overruled Ross's timely objection. Ross argues the district court clearly erred because he committed "a garden variety offense," namely, "using stolen credit card information and reserving a ticket on an airplane." That argument would have force in a case involving a single defendant who used a credit card without the cardholder's permission to buy a plane ticket. But Ross and his co-conspirators did far more to execute and conceal a massive conspiracy. They employed strategies to evade airlines' fraud-detection tools such as misspelling customers' names, purchasing tickets just before departure, booking outbound and return flights separately, and booking tickets at times when detection would be less likely. This

extensive scheme to defraud was far more than "routine" credit-card theft. The finding that Ross's conspiracy offense involved sophisticated means was not clearly erroneous. See United States v. Brown, 627 F.3d 1068, 1073 (8th Cir. 2010), cert. denied, 132 S. Ct. 274 (2011) (standard of review).

The judgments of the district court are affirmed.

_____